IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 12-00275 SOM |
| | ) | |
| Plaintiff, | ) | ORDER DENYING SILVA'S MOTIONS |
| | ) | TO SUPPRESS |
| vs. | ) | |
| | ) | |
| DARREN SILVA, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**ORDER DENYING SILVA'S MOTIONS TO SUPPRESS**

I.      **INTRODUCTION**

On April 26, 2012, Defendant Darren Silva filed two
motions to suppress.  See ECF Nos. 19 and 20.  The first argues
that Silva, a passenger in a car, should not have been detained
and that drugs seized from under the seat he occupied in the car,
as well as Silva's subsequent statements, should be suppressed.
The second motion argues that, because Silva did not properly
waive his constitutional rights, his subsequent statements should
be excluded.

An evidentiary hearing was conducted on June 29 and
July 6, 2012.  See ECF Nos. 100 and 105.

On July 12, 2012, Silva filed a supplemental memorandum
in which he conceded that he lacked "standing to seek suppression
of the drugs found at the scene of his arrest."  See ECF No. 109
at 2.  Silva now seeks suppression of only statements he made.
Id.

Both motions to suppress are denied.

II.      **FINDINGS OF FACT**

This court received oral testimony on June 29 and July 6, 2012.  Based on the live testimony and the exhibits received in evidence, the court finds the following by a preponderance of the evidence.

A.   Darren Lee, Richard Jones, Jaret Fernandez, Thayne Costa, Charles Rezentez, Ryan Miyataki, Adam Choka, Kriss Cockett, Sean Springer, Matthew Rumschlag, and Guy Shigemasa testified credibly.

B.   Darren Lee, a nine-year veteran of the Honolulu Police Department assigned to the Narcotics/Vice Division with the Airport Task Force at the Honolulu International Airport, testified that, on March 12, 2012, he received a call from Daniel Taglier of the Los Angeles Police Department.  See Test. of Darren Lee, ECF No. 113 at 11-12.  Taglier told Lee that, after talking with Guy Shigemasa at the Los Angeles International Airport, LAPD seized three tracking receipts--a FedEx parcel receipt and two UPS parcel receipts.  Id. at 13.

C.   Taglier further told Lee that Shigemasa had confessed to having flown from Honolulu to California to meet with Frank Ancheta, who planned to purchase methamphetamine. Shigemasa told Taglier that Ancheta arranged to buy eight pounds of methamphetamine.  Lee Test., ECF No. 113 at 13-14.  According to Shigemasa, four pounds of the methamphetamine were given to a

2

Samoan individual who took it to Las Vegas.  From there, it was supposed to be smuggled into Honolulu and delivered to Ancheta. Id. at 14; Test. of Richard Jones, ECF No. 113 at 55.  Shigemasa said that the remaining four pounds of methamphetamine were divided into three parcels and shipped to Hawaii.  Lee Test., ECF No. 113 at 13-14.

D.    Shigemasa told the officers that Ancheta had stayed at the La Quinta Inn in Chula Vista, California.  Officers verified that Ancheta had been staying there and that he paid for his room with cash.  Lee Test., ECF No. 113 at 16-17

E.    A check of the tracking numbers of the three receipts seized indicated that the FedEx package was still in Los Angeles and that the UPS packages were scheduled to arrive in Honolulu on March 13 and 14, 2012.  Lee Test., ECF No. 113 at 15.

F.    The FedEx package was seized and opened by the LAX Task Force pursuant to a search warrant.  Approximately one pound of methamphetamine was found in that package.  Lee Test., ECF No. 113 at 15.

G.    The Airport Task Force in Honolulu seized the UPS package scheduled to be delivered on March 13, 2012, pursuant to a search warrant.  About one pound of methamphetamine was found in that package.  Lee Test., ECF No. 113 at 16.

H.    The UPS package scheduled to be delivered on March 14, 2012, was addressed to Clifford Conte.  That package

was also seized pursuant to a search warrant and contained about two pounds of methamphetamine.  Lee Test., ECF No. 113 at 16.

I.   On March 13, 2012, Shigemasa flew back to Hawaii from California.  See Test. of Guy Shigemasa, ECF No. 114 at 98. Shigemasa was met at the Honolulu International Airport by his girlfriend, Janice Fontes.  Id.  Shigemasa and Fontes spent the night of March 13, 2012, together at Fontes's home.  Id.

J.   In the early afternoon of March 14, 2012, law enforcement agents obtained a search warrant for Ancheta's residence on Oahu to look for the four pounds of methamphetamine that was supposedly coming in from Las Vegas.  Jones Test. at 55-56, ECF No. 113.

K.   On March 14, 2012, Shigemasa met with Darren Lee of HPD and the Airport Task Force at the Airport Task Force office at the Honolulu International Airport.  At about 4:00 p.m., Shigemasa phoned Ancheta, with Lee listening.  Shigemasa told Ancheta that he had the parcels of methamphetamine and that he wanted to meet with Ancheta to give them to him.  Lee Test., ECF No. 113 at 19, 22-23.  Shigemasa and Ancheta agreed to meet at the Mililani Shopping Center at 5:00 p.m. that day.  Id. at 23.

L.   Shigemasa told officers on March 14, 2012, that Conte, the person to whom one of the packages of methamphetamine was addressed, had received methamphetamine packages for

Shigemasa in the past and was part of Shigemasa's "crew."
Shigemasa told Lee that he paid Conte about $1,000 per package in
either drugs or cash.  Lee Test., ECF No. 113 at 21;  Test. of
Thayne Costa, ECF No. 113 at 177.

      M.   On March 14, 2012, at about 5:00 p.m., Shigemasa
drove with Officer Thayne Costa of the Airport Task Force in
Honolulu and Darren Lee to the Mililani Shopping Center in a
Dodge Durango.  Shigemasa Test., ECF No. 114 at 106; Lee Test.,
ECF No. 113 at 23-24, 40.  Officers had a picture of Ancheta and
knew that Ancheta had felony drug convictions.  Lee Test., ECF
No. 113 at 20-21.  Costa was in charge of the operation to
apprehend Ancheta, while Special Agent Richard Jones of the DEA
was running the field operation.  Id.

      N.   When Lee, Costa, and Shigemasa did not see
Ancheta at the prearranged location, Lee drove the car across the
street to a Jack-in-the-Box parking lot to wait for Ancheta to
arrive.  As the car Shigemasa was in entered the lot, Shigemasa
saw Ancheta leaning into the driver's window of a silver-gray
Honda CRV parked nearby.  Shigemasa pointed out Ancheta to Lee
and Costa and said that the Honda CRV belonged to Conte, the man
in his "crew" to whom he had been sending methamphetamine, and
that Conte was in the driver's seat.  Lee Test., ECF No. 113 at
25.

O.     Shigemasa also identified Darren Silva as the person in the front passenger's seat.  Shigemasa told Lee and Costa that Silva was Conte's friend, was a drug user, had just been released from jail, and was on probation for a drug offense. Lee Test., ECF No. 113 at 25-26, 155; Costa Test., ECF No. 113 at 166.  According to Lee, that information was "put out over the radio."  Lee Test., ECF No. 113 at 26.  Officers were not at that time able to identify a third person sitting in the back seat of the Honda CRV.  Jones Test., ECF No. 113 at 94.

P.     Shigemasa was initially nervous and jittery while testifying before this court.  He began by testifying that, because he did not have his glasses with him, he could not see who was in the Honda CRV, although he recognized the Honda CRV as Conte's.  Shigemasa Test., ECF No. 114 at 110-12.  However, as his testimony progressed, Shigemasa conceded that he told Costa and Lee, "That's Clifford Conte" and that Conte was in his "crew."  Shigemasa also acknowledged that, as the officers testified, he told them that "[t]he guy in the car is Darren Silva," that Silva "just got out of jail," and that Silva was a drug user.  Id.

Q.     The Honda CRV, which had not been in a stall when first seen, reversed into a parking stall.  Lee Test., ECF No. 113 at 28.  Costa, having informed other officers that Ancheta had been spotted, told the officers to move in and arrest

Ancheta.  Lee Test., ECF No. 113 at 27, 50; Costa Test., ECF No. 113, at 165.  In response, Richard Jones, Matthew Rumschlag, and Charles Rezentez pulled into the parking lot in their respective vehicles.  Lee Test., ECF No. 113 at 29.  Other law enforcement officers present included Ryan Miyataki, Kris Cockett, Jeff Mertens, and Jaret Fernandez.  Id. at 41-42; Jones Test., ECF No. 113 at 59-61.  The officers were in plainclothes, but were wearing body armor that said "Police" and/or "DEA" and had their badges displayed.  Lee Test., ECF No. 113 at 42-43.

R.   Lee testified that it was common practice for law enforcement to approach vehicles in drug apprehensions with guns drawn.  Lee Test., ECF No. 113 at 44.  Jones noted that violence often goes with drug trafficking and that, because the occupants of the Honda CRV might have been there to provide security for the drug deal, he was concerned about officer safety.  Jones Test., ECF No. 113 at 78, 96, 128.

S.   Although he himself probably did not draw his weapon, Jones remembered seeing other officers with their weapons drawn.  Jones Test., ECF No. 113 at 67, 120.  Jones specifically remembered seeing Matthew Rumschlag with his weapon drawn but down by his side.  Id. at 68.  Rumschlag could not actually remember whether he drew his weapon, but said that, if he did, it would have been "down to his hip."  Test. of Matt Rumschlag, ECF No. 114 at 130.  Officer Ryan Miyataki testified that he drew his

7

weapon when he was "addressing" the passenger in the back seat. Test. of Ryan Miyataki, ECF No. 113 at 214; ECF No. 114 at 60. Miyataki pointed his weapon at the passengers and used a stern voice to say to the people in the Honda CRV, "Police. Let me see your hands." ECF No. 113 at 215-17. As soon as it appeared safe, Miyataki put his gun back into its holster. ECF No. 114 at 60.

T. Rumschlag testified that the occupants of the Honda CRV were told that they were being detained so that officers could figure out their involvement with another vehicle that Ancheta had been going over to. ECF No. 114 at 131.

U. According to Jones, Cockett and Mertens were the officers who took Ancheta into custody as he was going toward a red SUV driven by a man whose surname was Llanos. Jones Test., ECF no. 113 at 62, 65. Officer Charles Rezentez also went to arrest Ancheta. Rezentez testified that he had his gun drawn as he approached Ancheta, Test. of Charles Rezentez, ECF No. 113 at 203, and Officer Kriss Cockett also had his gun drawn. Test. of Kriss Cockett, ECF No. 114 at 84, 86.

V. Meanwhile, Conte, the driver of the Honda CRV, was asked to turn his engine off. Jones Test., ECF No. 113 at 63, 114; Test. of Jaret Fernandez, ECF No. 113 at 136. Jaret Fernandez, an officer in an HPD plainclothes unit, testified that he asked Conte for his driver's license and proof of insurance.

Test. of Jaret Fernandez, ECF No. 113 at 129-30, 134-35.
Fernandez was armed, but says he did not have his gun drawn. Id.
at 134. Fernandez asked all three people in the Honda CRV to
keep their hands where they could be seen. Id. at 135.

W.   Lee used his cell phone to call Special Agent
Jones to tell him that Shigemasa had identified Conte and Silva
as being in the Honda CRV, with Ancheta outside that car. Lee
Test., ECF No. 113 at 27. Jones asked Lee to ask Shigemasa
whether there was dope in the car. Id. at 30. Shigemasa
indicated to Lee that there was probably dope in the car because
Conte and Silva were users and usually had methamphetamine in
their possession. Id. To ensure that Jones had this
information, Lee walked over and told Jones that Shigemasa had
said there was probably dope in the car. Id. at 30-31. Lee says
that Conte and Silva were being detained in the car at the time.
Id. at 31.

X.   Lee then drove off in his vehicle, hoping to
debrief Shigemasa and arrive at the Airport Task Office before
the occupants of the Honda CRV. Lee Test., ECF No. 113 at 33-34.

Y.   Jones patted Ancheta down and pulled out what
appeared to be a rental car key. Ancheta initially told Jones
that a friend had driven him there. When Ancheta refused to
identify the friend, Jones thought that he might have driven
himself. Jones then walked around the parking lot clicking the

remote but could not find a matching car.  In the meantime,
Ancheta sat in Jones's vehicle.  Jones Test., ECF No. 113 at 64.

Z.    Jones then went to talk to Llanos, the driver of
the red SUV.  Llanos told Jones that Ancheta had driven to
Llanos's house in some sort of rental car and that Llanos had
then driven Ancheta to the Mililani Shopping Center.  Jones
Test., ECF No. 113 at 65.  Jones says he then asked Ancheta for
permission to search the rental car, and Ancheta agreed.  Id. at
66.

AA.    The three people in the Honda CRV--Conte, Silva,
and a man that officers concluded had previously been arrested
for murder--sat in their car for a while, without being
handcuffed.  Jones Test., ECF No. 113 at 67, 77; Fernandez Test.,
ECF No. 113 at 138.  Jones testified that, during that time,
officers were trying to figure out why Conte was there.  Jones
Test., ECF No. 113 at 74.  Jones did not have enough information
to conclude that the men in the Honda CRV were involved in the
drug deal, possibly conducting counter-surveillance or providing
security.  Id. at 74-75, 91, 96.  Jones was conscious that four
pounds of methamphetamine that was supposed to arrive from Las
Vegas was still unaccounted for.  Id. at 75, 101.

BB.    Because Conte's name was on one of the
intercepted packages, Jones, suspecting that Conte was indeed
part of the drug conspiracy, wanted to search the Honda CRV.  Id.

Consent to search was not obtained, but the officers searched the vehicle pursuant to the automobile exception.  Id. at 77.

CC.    Before searching the Honda CRV, the officers had the three people in it get out.  By that time, about 15 to 20 minutes had passed since officers had first approached the car. The three men had clearly not been free to leave during that time.  They were patted down after getting out, then were moved to the area behind the car.  Jones Test., ECF No. 113 at 77, 118-19; Fernandez Test. ECF No. 113 at 138; Rumschlag Test., ECF No. 114 at 131, 133, 135.

DD.    The Honda CRV belonged to Conte's parents. Fernandez Test., ECF No. 113 at 138.  Jones searched the driver's side of the car, and Miyataki searched the front passenger side. Miyataki found a black fanny pack under the front passenger seat about six inches from the start of the area under the seat.  He unzipped the fanny pack and handed it to Jones, who found in it a glass pipe and several bags of a white crystalline substance. Jones Test., ECF No. 113 at 78-79, 105; Miyataki Test., ECF No. 113 at 219-20.  Nothing in or on the fanny pack connected it to anyone.  Costa Test., ECF No. 113 at 180, 184-85.  Believing that the substance was methamphetamine, Jones arrested Conte and Silva, reasoning that Conte was going to be arrested anyway for his part in the methamphetamine drug conspiracy and that there was a "good probability" that the drugs found under the passenger

11

seat belonged to Conte or Silva.  Jones thought it would have
been difficult for the person in the back seat to have stashed
the fanny pack under the front passenger seat.  Jones Test., ECF
No. 113 at 79, 107, 109.  Miyataki noted that the back seat of
the Honda CRV was folded down and that a large, plastic storage
container containing clothes and a blanket was sitting on top of
the folded-down seat.  Tools and miscellaneous junk were on the
floor behind the front passenger seat.  In Miyataki's opinion,
the back-seat passenger would have been blocked from putting the
fanny pack where it was found.  Miyataki Test., ECF No. 113 at
226-27, 230-31; ECF No. 114 at 55-57, 59.  Officer Sean Springer
also saw that the back of the Honda SUV was cluttered.  Test. of
Sean Springer, ECF No. 114 at 88, 91.

        EE.    Adam Choka, an investigator with the Office of
the Federal Public Defender, testified that he later examined
Conte's parents' Honda CRV.  Test. of Adam Choka, July 6, 2012,
ECF No. 114 at 65.  Choka testified that the back-seat passenger
could have put the fanny pack under the front passenger seat, but
conceded that he had not known at the time of his examination
what was on the floor of the back seat of the Honda CRV on the
day Silva was arrested.  Id. at 71, 74.

        FF.    Agent Jones testified that the amount of drugs
in the fanny pack and the way they were packaged were consistent
with drug distribution, not drug use.  Jones admitted that he

                                12

knew at that time that Conte and the person in the back seat had records as drug dealers.  Jones knew Silva had been involved with drugs but did not know whether Silva's record was for drug distribution or drug use.  Jones Test., ECF No. 114 at 79-82.

GG.   According to Jones, Silva and Conte were arrested about 15 to 20 minutes after Ancheta was identified. Jones Test., ECF No. 113 at 80.  The person in the back seat of the Honda CRV was not arrested.  Id. at 88, 107.

HH.   Jones talked with Silva later that evening at the Airport Task Force office.  Silva was not handcuffed at that time, and Jones was not armed.  Jones and Costa advised Silva of his rights, using a DEA form.  Jones Test., ECF No. 113 at 81-83, 85; Costa Test., ECF No. 113 at 178-79.  Before Silva waived his rights, he had an opportunity to eat, drink, and use the bathroom.  Jones Test., ECF No. 113 at 82.  Silva signed and initialed the form, indicating that he had been advised of and understood his rights and was voluntarily waiving those rights. Id. at 85-87; Ex. 1, ECF No. 96-1.

II.   Silva confessed that the fanny pack was his (along with the methamphetamine in the fanny pack).  Jones Test., ECF No. 113 at 87; Costa Test., ECF No. 113 at 183.  He said that he had bought about a quarter-ounce of methamphetamine from a girl named Shawna for $400.  Jones Test., ECF No. 113 at 87;

Costa Test., ECF No. 113 at 183.  Silva did not admit to being a
drug dealer.  Costa Test., ECF No. 113 at 179.

## III.     CONCLUSIONS OF LAW REGARDING MOTION 1--INVESTIGATIVE STOP.

A.  Before the court are motions radically different
from what Silva originally filed.  <u>See</u> Transcript of Proceedings,
ECF No. 114 at 9.  Recognizing during the hearings that Silva's
arguments were shifting, the court asked for "a new brief so that
I can understand exactly what is being argued."  <u>Id.</u> at 141.  On
July 12, 2012, Silva submitted that new brief.  <u>See</u> ECF No. 109.
Silva states in that brief, "The defense seeks to suppress
Mr. Silva's statements but it concedes that Mr. Silva does not
have standing to seek suppression of the drugs found at the scene
of his arrest."  <u>Id.</u> at 2.  The court deems the arguments raised
in this brief to supersede arguments raised in earlier briefs.

B.   The Fourth Amendment protects the "right of the
people to be secure in their persons, houses, papers, and
effects, against unreasonable searches and seizures."  <u>See</u> <u>United
States v. Place</u>, 462 U.S. 696, 701 (1983).  The Fourth Amendment
does not forbid all searches and seizures, only unreasonable
ones.  <u>Terry v. Ohio</u>, 392 U.S. 1, 9 (1968).  Unless a warrantless
search or seizure falls within at least one of a few exceptions,
they are <u>per se</u> unreasonable.  <u>See</u> <u>Morgan v. United States</u>, 323
F.3d 776, 781 (9th cir. 2003).

C.   Before a court analyzes whether a search or a seizure is reasonable or unreasonable, the court must find that there was a "search" or a "seizure." <u>Yin v. State of California</u>, 95 F.3d 864, 874 (9th Cir. 1996).  Because Conte and Silva were "detained" and not free to leave while in the Honda CRV or later when they were asked to go behind the car, they were seized for Fourth Amendment purposes.  <u>See</u> <u>Terry</u>, 392 U.S. at 16 ("It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person"); <u>Nelson v. City of Davis</u>, 685 F.3d 867, 875 (9th Cir. 2012) ("'A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer by means of physical force or show of authority terminates or restrains his freedom of movement through means intentionally applied.'" (quoting <u>Brendlin v. Cal.</u>, 551 U.S. 249, 254(2007)).  To determine whether Silva's statements should be suppressed as the fruit of an unconstitutional seizure, the court therefore examines whether Silva's seizure was reasonable.

D.   An officer may stop and briefly detain a person for investigative purposes if that officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot.  <u>Terry</u>, 392 U.S. at 30.  An investigative stop "must be temporary and last no longer than is necessary to

effectuate the purpose of the stop." <u>Florida v. Royer</u>, 460 U.S. 491, 500 (1983). The Ninth Circuit has characterized "reasonable suspicion" as "specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for particularized suspicion." <u>United States v. Montero-Camargo</u>, 208 F.3d 1122, 1129 (9th Cir. 2000). Because of the limited nature of an investigative stop, probable cause is not necessary to justify it. <u>See</u> <u>United States v. Brignoni-Ponce</u>, 422 U.S. 873, 880 (1975).

     E.   The law enforcement officers were entitled to conduct an investigatory stop of the passengers in the Honda CRV because they had reasonable suspicion supported by articulable facts that criminal activity may have been afoot. Guy Shigemasa had confessed to purchasing about eight pounds of methamphetamine with Ancheta in California. Officers had seized approximately four pounds of that methamphetamine in three packages sent to Hawaii, one of which was addressed to Conte, the driver of the Honda CRV. Another four pounds of methamphetamine had supposedly been smuggled into Hawaii and given to Ancheta. Shigemasa, cooperating with law enforcement, called Ancheta to set up delivery of the four seized pounds at the Mililani Shopping Center. At the appointed time and place for the meeting, officers, not immediately seeing Ancheta, drove to a nearby Jack-in-the-Box to wait for Ancheta to arrive. When they got to the

16

parking lot of that restaurant, they saw Ancheta talking with
Conte through the window of the Honda CRV Conte was driving.
Shigemasa identified Conte as part of his "crew" and as the man
to whom Shigemasa had been sending methamphetamine.  Shigemasa
identified the passenger as Darren Silva and noted that Silva was
a drug user.  Shigemasa told officers that there were probably
drugs in the Honda CRV.

       F.   The officers did not know why Conte was at the
scene of the drug deal and reasonably suspected that the
occupants of the Honda CRV were providing security to Ancheta or
counter-surveillance for the drug deal.  For all the officers
knew, the Honda CRV held the missing four pounds of
methamphetamine.  The officers did know that Conte was involved
in the drug conspiracy.  The officers had a reasonable suspicion
that criminal activity was afoot.  See United States v. Cortez,
449 U.S. 411, 417 (1981) ("An investigatory stop must be
justified by some objective manifestation that the person stopped
is, or is about to be, engaged in criminal activity").  The
officers were therefore justified in briefly detaining Silva, a
person in the car who had been described as a drug user, to
determine whether he too was involved with the suspected drug
deal or whether he posed a danger to the officers.  See United
States v. Vaughan, 719 F.2d 332, 334 (9th Cir. 1983) (police had
the right to briefly detain an unknown passenger in the back seat

17

of a car driven by a suspected drug dealer to determine whether there was evidence in the driver's possession or in the car that incriminated the passenger; police also had the right to do a Terry "stop and frisk" to determine whether the passenger posed a danger to the officers); United States v. Rivers, 121 F.3d 1043, 1045 (7th Cir. 1999) (police may conduct a Terry stop of passenger in car when driver is suspected of drug activity).  The officers were also justified in ordering the occupants of the Honda CRV out of the car.  See Maryland v. Wilson, 519 U.S. 408, 410 (1997) (holding that police may order the driver and passenger out of a lawfully stopped car).

G.   Silva argues that, because officers approached the Honda CRV with guns drawn, he was, in essence, arrested at that time such that the officers needed probable cause, not just reasonable suspicion.  The court disagrees.

H.   There is "no bright-line" for determining when an investigatory stop crosses the line into an arrest.  United States v. Parr, 843 F.2d 1228, 1231 (9th Cir. 1988) (quotation and citation omitted).  "[W]hether an arrest has occurred depends on the totality of the circumstances."  United States v. Buffington, 815 F.2d 1292, 1300 (9th Cir. 1987).  To determine whether there was an investigatory stop requiring only reasonable suspicion or a more intrusive seizure requiring probable cause, courts examine the circumstances, balancing "the nature and

quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion." United States v. Hensley, 469 U.S. 221, 228 (1985).

      I.   Officers are entitled to take reasonably necessary steps to protect their personal safety and maintain the status quo during the course of an investigatory stop. Id. at 235. "It is well settled that when an officer reasonably believes force is necessary to protect his own safety or the safety of the public, measures used to restrain individuals, such as stopping them at gunpoint and handcuffing them, are reasonable." Alexander v. Cnty. of Los Angeles, 64 F.3d 1315, 1320 (9th Cir. 1995). Officer Lee testified that, whenever drugs are involved, he has concerns about violence. Special Agent Jones similarly testified about the connection between drugs and violence and about his thinking that the occupants of the Honda CRV were possibly providing security for the drug deal. The officers acted reasonably in approaching the Honda CRV with guns drawn, thinking that its occupants might be involved in the drug deal and might be armed or violent. See United States v. Davis, 530 F.3d 1069, 1082-83 (9th Cir. 2008) ("Because officers reasonably suspected that Richard Davis was involved in narcotics activity, it was also reasonable for them to suspect that he might be armed."); United States v. Savinovich, 845 F.2d 834, 837

(9th Cir. 1988) (noting that guns are used in many drug transactions).

J.    Contrary to Silva's assertion, he was not arrested when officers approached the vehicle with their guns drawn.  In <u>United States v. Jacobs</u>, 715 F.2d 1343, 1345 (9th Cir. 1983), for example, the Ninth Circuit stated that an "investigative stop did not become an arrest when the deputy pointed his gun at defendant and ordered her to 'prone out.'" The Ninth Circuit noted in <u>Jacobs</u> that use of such force does not convert an investigatory stop into an arrest "if it occurs under circumstances justifying fears for personal safety."  <u>Id.</u> (quoting <u>United States v. Beck</u>, 598 F.2d 497, 501 (9th Cir. 1979)).

K.    In <u>Buffington</u>, 815 F.2d at 1300, the Ninth Circuit similarly stated that "officers conducting investigatory stops . . . may take reasonable measures to neutralize the risk of physical harm and to determine whether the person in question is armed" and that the "use of force during a stop does not convert the stop into an arrest if it occurs under circumstances justifying fears for personal safety."  In the present case, officers approached the Honda CRV with guns drawn and asked the occupants to keep their hands where they could be seen.  No testimony established that officers kept their guns pointed at the occupants, including Silva, for a sustained period.  Instead,

the guns appear to have been drawn only for the time needed to ensure officer safety.  Under the totality of the circumstances, no arrest occurred merely because officers briefly pointed guns at the occupants of the Honda CRV.

L.   Silva's reliance on <u>United States v. Robertson</u>, 833 F.2d 777 (9th Cir. 1987), for the proposition that an arrest occurs when an officer points a gun at a suspect is unavailing. In that case, officers went to a suspected "crank lab."  When they arrived, they saw a woman leaving the house on a walkway. The officers told the woman to freeze at gunpoint.  <u>Id.</u> at 778-79.  Under these circumstances, the Ninth Circuit noted, "Nothing in the record suggests that the display of force was necessary to ensure her compliance with a request to stop."  <u>Id.</u> at 781.  The woman was not armed and the officers made no attempt to determine whether she was armed.  <u>Id.</u>  The woman could have been an innocent visitor to the house, as there was no indication that she was involved in criminal activity.  <u>Id.</u> at 782.  The purpose of a <u>Terry</u> stop--to allow officers to investigate without fear of flight or violence--was not served by holding the woman at gunpoint, as she was not even checked for weapons.  <u>Id.</u>  Under the totality of these circumstances, the Ninth Circuit determined that the woman's detention amounted to an arrest requiring probable cause.  <u>Id.</u>

M.   Unlike the woman in <u>Robertson</u>, Silva was in a car at the time and place a drug deal had allegedly been scheduled, and he was with an alleged member of the drug conspiracy.  The occupants of the car were physically positioned as if providing security or counter-surveillance for the drug deal.  Officers had reason to be concerned that the occupants of the car were armed, as is often the case during drug trafficking.  <u>Robertson</u> is therefore distinguishable.

N.   Silva's reliance on <u>Kraus v. Pierce County</u>, 793 F.2d 1105 (9th Cir. 1986), is similarly misplaced.  The <u>Kraus</u> decision involved a summary judgment motion in a § 1983 civil case.  The defendant officers in that case had been investigating a robbery at a bank machine by an armed black male.  <u>Id.</u> at 1107. A bystander saw the robbery and chased the robber, lost sight of him, but did see a red hatchback automobile speed out of the parking lot and run stop signs.  The bystander wrote down the license plate of the automobile and called the police.  <u>Id.</u> Using the bystander's information, the officers determined the address of the car's owners, went to that address, and found the car still warm.  Mr. and Mrs. Kraus, their daughter, and a friend were watching television inside the house when a dispatcher called the house and asked Mr. Kraus to step outside.  Mr. Kraus and the friend went outside and were "bathed in floodlights and surrounded by at least five sheriffs' deputies, some of whom had

weapons drawn." Id. Under the totality of these circumstances, the Ninth Circuit determined that Mr. Kraus and his friend were effectively arrested without probable cause. The court noted that a reasonable person in that situation would not have believed that he was free to leave. Id. at 1109.

O. Because the officers in Kraus lacked evidence tending to show that the individuals were driving the car or linked to the robbery, those officers lacked probable cause to arrest them. Id. at 1109. The Ninth Circuit concluded that the officers were not entitled to qualified immunity for that arrest, as reasonable officers would not have believed they had probable cause. Id. at 1110.

P. Unlike the officers in Kraus, the officers in this case had reason to suspect that the occupants of the Honda CRV were armed and possibly providing security for the drug deal with Ancheta. The officers knew that Conte, the driver of the vehicle, was involved with the drug conspiracy. Silva was at the scene with Conte right when a drug transaction was scheduled to occur. Under the circumstances, the officers acted reasonably in approaching the Honda CRV with guns drawn.

Q. Silva contends that his detention was unreasonable and amounted to an arrest. He notes that he was asked to stay in the Honda CRV with his hands visible to the officers for 15 to 20 minutes before the drugs were found in the

car.  That detention, he says, amounted to a <u>de facto</u> arrest, not a brief investigatory stop.

R.    The Supreme Court has not established a clear timeline governing when an investigative detention is so long that it becomes an unreasonable <u>de facto</u> arrest.  The Court has instead noted that "common sense and ordinary human experience must govern over rigid criteria."  <u>United States v. Sharpe</u>, 470 U.S. 675, 685 (1985).  Courts should consider the "law enforcement purposes" served by the stop "as well as the time reasonably needed to effectuate those purposes."  <u>Id.</u>  The Court has admonished courts making this assessment to "take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing."  <u>Id.</u> at 686.

S.    In <u>Sharpe</u>, the Supreme Court found a 20-minute investigatory stop not to have been an arrest.  The defendants in that case presented no evidence that the officers had been dilatory, and the length of the detention was attributable to actions by another defendant.  <u>Id.</u> at 687-88.  Here, there is no evidence that officers were dilatory.  To the contrary, the evidence demonstrates that officers were attempting to apprehend Ancheta, determine the identities and involvement of the people in the two vehicles, and figure out how Ancheta had gotten to the shopping center.  Given the number of suspects involved and the

nature of the drug conspiracy, a 15- to 20-minute wait while officers attempted to sort things out was not unreasonable.

T. Silva posits that officers could have taken an alternative course of action. Silva proposes that officers should have arrested Conte and removed Silva from the vehicle. He says that, rather than holding him behind the vehicle, they should have released Silva before searching the car. However, as the Supreme Court has noted, even if government objectives could have been accomplished by something less intrusive, that does not render a search unreasonable. "The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it." Sharpe, 470 U.S. at 687. The officers did not know whether the people in the Honda CRV were providing security or counter-surveillance for the drug deal with Ancheta or whether the Honda CRV contained the missing four pounds of methamphetamine. They did know that Conte, the driver of the car, was a member of the methamphetamine conspiracy with Shigemasa and Ancheta. Although, with respect to Silva, the officers lacked enough information to conclude that he was involved with the drug conspiracy, they did have a basis to detain him briefly while they searched the car. That detention was reasonable under the circumstances.

U. Citing United States v. Lopez, 482 F.3d 1067, 1073 (9th Cir. 2007), Silva further argues that, even if the

initial detention was reasonable, he should not later have been arrested or should have been released because probable cause had dissipated. Silva agues that officers knew the Honda CRV did not belong to him, that there was no identification showing who owned the fanny pack, that there was no way of knowing who had put the fanny pack under the passenger seat, that the amount of methamphetamine indicated that it was for personal use, that Silva did not have a criminal record for drug dealing, and that Silva did not sign a <u>Miranda</u> waiver until more than five hours after he was first detained. For the most part, these arguments go not to "dissipating probable cause," but instead to whether the Government can prove its case at trial. Officers did not disregard facts tending to dissipate probable cause. Instead, as Agent Jones opined, the location of the fanny pack six inches under the front passenger seat (while the back seat floor area was cluttered and the back seat was down with a plastic container on it) indicated that it likely belonged to Silva. The only argument relevant to the suppression issue goes to the voluntariness of Silva's waiver of his <u>Miranda</u> rights, a subject discussed below.

V. The court therefore denies the first motion to suppress statements as the fruit of an illegal seizure.

**IV.     CONCLUSIONS OF LAW REGARDING MOTION 2--MIRANDA
         WARNINGS.**

         A.    In <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), the
Supreme Court established that, when a person is "in custody,"
procedural safeguards must be afforded that person before the
person is questioned.  Otherwise, the prosecution may not use
what it learns through its interrogation.  <u>Id.</u> at 444.  This rule
was premised on the Fifth Amendment's privilege against self-
incrimination.  The Court reasoned that the privilege against
self-incrimination is protected when a person is adequately and
effectively advised of his or her rights.  <u>See id.</u> at 467.  Any
such waiver must be voluntary, knowing, and intelligent.  <u>Id.</u> at
445.

         B.    The initial question here is whether Silva
underwent "custodial interrogation" without having been advised
of his <u>Miranda</u> rights.  There is no evidence that Silva was
questioned (except for being asked his identity) before reaching
the Airport Task office, where he was undeniably in custody.  <u>See</u>
<u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983); <u>United States</u>
<u>v. Norris</u>, 428 F.3d 907, 912 (9th Cir. 2005) ("A person is in
custody only where there is a formal arrest or restraint on
freedom of movement of the degree associated with a formal
arrest."); <u>United States v. Luther</u>, 521 F.2d 408, 410 (9th Cir.
1975) ("By 'custodial interrogation' the <u>Miranda</u> Court meant
questioning initiated after a person was taken into custody or

27

otherwise deprived of his freedom in any significant way.").
Accordingly, officers were required to inform Silva of his
<u>Miranda</u> rights before interrogating him.

      C.    The Supreme Court has indicated that no
"talismanic incantation" of warnings is necessary to satisfy the
strictures of <u>Miranda</u>.  <u>See</u> <u>California v. Prysock</u>, 453 U.S. 355,
359 (1981).  The Government has the burden of proving a waiver of
rights by a preponderance of the evidence.  <u>See</u> <u>Colorado v.</u>
<u>Connelly</u>, 479 U.S. 157, 168-69 (1986).

> To satisfy this burden, the prosecution must
> introduce sufficient evidence to establish
> that under the "totality of the
> circumstances," the defendant was aware of
> "the nature of the right being abandoned and
> the consequences of the decision to abandon
> it."  The government's burden to make such a
> showing "is great," and the court will
> "indulge every reasonable presumption against
> waiver of fundamental constitutional rights."

<u>United States v. Garibay</u>, 143 F.3d 534, 536-37 (9th Cir. 1998).

      D.    In examining whether a waiver was voluntary,
knowing, and intelligent, a court looks at whether the waiver was
voluntary "in the sense that it was the product of a free and
deliberate choice rather than intimidation, coercion, or
deception," and whether the waiver was made "with a full
awareness of both the nature of the right being abandoned and the
consequences of the decision to abandon it."  <u>Moran v. Burbine</u>,
475 U.S. 412, 421 (1986).

E.   The Ninth Circuit has provided guidance for examining the "totality of the circumstances" surrounding a waiver, saying that a court should be guided by:

> (1) whether the defendant signed a written waiver; (2) whether the defendant was advised of his rights in his native tongue; (3) whether the defendant appeared to understand his rights; (4) whether a defendant had the assistance of a translator; (5) whether the defendant's rights were individually and repeatedly explained to him; and (6) whether the defendant had prior experience with the criminal justice system.

Garibay, 143 F.3d at 538 (citations omitted).

F.   Jones's and Costa's credible testimony establishes that, under the totality of the circumstances, Silva's waiver of rights was knowing, voluntary, and intelligent. Silva had a prior criminal record.  He was not handcuffed, and the officers were not armed at the time of the waiver.  Before waiving his rights, Silva was given the opportunity to eat, drink, and use the bathroom.  Silva then signed and initialed the Advice of Rights form, indicating that he understood and was voluntarily waiving his rights.  Nothing in the record suggests that Silva's native language was anything other than English. Under these circumstances, Silva's waiver was voluntarily, knowingly, and intelligently made.

G.   The court therefore denies the second motion to suppress.

**IV.      CONCLUSION.**

        Both of Silva's motions to suppress, ECF Nos. 19 and 20, are denied.

        IT IS SO ORDERED.

        DATED: Honolulu, Hawaii, August 21, 2012.



                         /s/ Susan Oki Mollway
                        Susan Oki Mollway
                        Chief United States District Judge